**OFFICE OF the COMPTROLLER GENERAL OF the REPUBLIC OF BOLIVIA on Behalf of the GENERAL COMMAND OF the BOLIVIAN AIR FORCE, and Central Bank of Bolivia, Plaintiffs,**

v.

**INTERNATIONAL PROMOTIONS AND VENTURES, LTD., and Larry Tractman, Defendants.**

No. 83 Civ. 7707 (BN)(RJW).

United States District Court, S.D. New York.

Sept. 4, 1985.

Walter L. Stratton and Mitchell A. Karlan, Gibson, Dunn & Crutcher, New York City, for plaintiffs.

Thomas Torto, Brooklyn, N.Y., for defendants.

*Opinion and Order On Plaintiffs'*
*Motion for Summary Judgment*

BERNARD NEWMAN, Senior Judge of the United States Court of International Trade, sitting by designation:

This diversity action has its genesis in two contracts executed in 1981 and 1982 by the plaintiff Bolivian Air Force[1] and defendants, International Promotions and Ventures, Ltd. ("IPVL") and Larry Tractman, president of IPVL, concerning the purchase of certain military aircraft, related equipment and services. Plaintiffs sue to recover possession of certain promissory notes delivered to defendants with a face value of $33.01 million, or alternatively for damages equal to the face amount of the notes plus accrued interest. Defendants counterclaim seeking damages for breach of contract and fraudulent misrepresentations, which allegedly frustrated defendants' efforts in performing the contracts.

Presently before the court is plaintiffs' motion for summary judgment. In support of their motion, plaintiffs rely upon the stipulated facts in the Joint Pretrial Order of May 23, 1985 and numerous documentary exhibits attached thereto and submitted with plaintiffs' Notice of Motion. In opposition, defendants contend that there are material issues of fact which must be decided by a trial.

For the reasons that follow, the court holds that there are no genuine or material issues for trial and that plaintiffs are entitled to summary judgment.

### The Facts

On September 30, 1981 the Bolivian Air Force and IPVL entered into a contract ("1981 contract") pursuant to which IPVL agreed to supply the Bolivian Air Force with fifty-two F–104 Starfighter airplanes, related equipment, spare parts, turbines, maintenance and training (exhibits A and B, Joint Pretrial Order). The 1981 contract provided that the Bolivian Air Force was to pay for the Starfighters and related goods and services by issuing to defendants, upon execution of the contract, promissory notes guaranteed by the Central Bank of Bolivia in the principal amount of approximately $69.9 million.

---

1. Under Bolivian law, the Office of the Comptroller General, an agency of the Government of the Republic of Bolivia, is authorized to prosecute actions on behalf of other government agencies, including the Bolivian Air Force, the Central Bank of Bolivia, and on its own behalf. Stipulated fact No. 1, Joint Pretrial Order dated May 23, 1985.

Under the 1981 contract, defendants were to purchase the Starfighters from the Belgium Government. When the 1981 contract was entered into, the parties were aware that Belgium could not sell the aircraft in question unless a transfer license was issued by the United States Government, acting through the State Department.[2] Additionally, the parties recognized that United States Government policy opposed the sale of military equipment to Bolivia. Anticipating the contingency that the required transfer license might not be granted by the United States Government, the parties expressly agreed to condition the 1981 contract upon defendants' obtaining such license. Hence, so far as pertinent, paragraph Ninth of the 1981 contract provides:

> NINTH: DURATION OF THE CONTRACT.—The present contract will become effective once the following requirements ha[ve] been complied with:
>
> \* \* \* \* \* \*
>
> Four.—The transfer license of the goods, object of the present contract, ha[s] been [obtained] by "THE SELLER" [defendants] in the United States of America, within the maximum deadline of thirty (30) days, computed from the time the present document was subscribed [i.e., September 30, 1981].

On or about September 30, 1981, date of execution of the 1981 contract, twenty-one promissory notes in the amount required by the contract (the September notes) were issued and subsequently delivered to agents of IPVL and to the Republic of Belgium. In conformance with the 1981 contract, the September notes were accompanied by letters of guarantee from the Central Bank. Although the 1981 contract required that plaintiffs deliver the promissory notes to defendants upon execution of the agreement, the contract also expressly stipulated that defendants were to return the notes if the United States did not issue the transfer license. In that regard, paragraph Thirtieth of the 1981 contract provides:

> ANNULMENT OF THE PROMISSORY NOTES AND LETTER OF GUARANTEE.—In case that the present Contract would not become in force by failure in obtaining the license of sale or the export permit, the promissory notes and letters of guarantee issued as a consequence of the execution and compliance of the Contract, will become ipso-facto null of full right and therefore without any legal value. *"THE SELLER" [defendants] should return them to "LA FAB" [the Bolivian Air Force] within a period of 3 days.* [Emphasis added.]

In late 1981, agents of IPVL attempted to discount certain of the September notes and obtain cash from the Bank of Luxembourg, which refused to accept any of the September notes presented by IPVL. It appears that defendants encountered difficulties with the letters of guarantee accompanying the September notes, which letters according to defendants, had been deliberately signed by the representative of the Central Bank in a manner designed to render the notes nonnegotiable. Thereafter, on December 7, 1981 the September notes were replaced by plaintiffs with reissued negotiable promissory notes, numbered 1 through 40, whose face amount totaled $80,953,567 (December notes), also guaranteed by the Central Bank (exhibit H, Joint Pretrial Order). December notes 1 through 10 were issued to the Belgium Air Force and delivered to the Belgium Government at its embassy in Washington, D.C. December notes 11 through 40 were issued to and accepted by IPVL. There is no dispute concerning the validity of the December notes. The September notes were returned to the Bolivian Air Force and destroyed.

Respecting the transfer license upon which the 1981 contract was conditioned, it appears from an affidavit executed on March 18, 1985 (annexed to plaintiffs' notice of motion) by the Honorable Samuel F. Hart, then United States Ambassador to

---

**2.** *See* 22 C.F.R. § 123.10(b) (1981).

Ecuador,[3] that in late 1981 or early 1982 Ambassador Hart officially advised the then President of Bolivia, General Torrelio, "that under no circumstances would the United States Government issue a transfer license for authorizing the sale of the Starfighters by Belgium to Bolivia". It further appears from Ambassador Hart's affidavit that in 1982 the Bolivian Ambassador to the United States, Julio Sanjines, raised the matter of a transfer license with Hart on several occasions, that Hart informed the Bolivian Ambassador there was no substance to reports that Mr. Tractman "had sufficient influence [within the State Department] to arrange for the transfer license to be issued," and further "there would be no change in United States policy on this question". Moreover, Ambassador Hart states in his affidavit that on April 8, 1982, "to quash any further speculation on the part of Ambassador Sanjines", Hart confirmed by letter the official decision of the Department of State to "oppose the sale of Belgian F–104 aircraft to the Government of Bolivia, should a formal request for such a sale be received" (exhibit C, Joint Pretrial Order). Lastly, to emphasize the adamant position of the United States Government respecting denial of a transfer license, Ambassador Hart's affidavit insists that "under no circumstances would the United States Government have issued the transfer license necessary to complete the sale in question. Any representation to the contrary by Mr. Tractman would simply be without basis".

The short of the matter is that the transfer license, upon which the 1981 contract was expressly conditioned, was not issued by the United States Government within thirty days, as required by paragraph Ninth of the contract, and in point of fact the transfer license has never been issued.

Anticipating that a reversal of United States policy could be achieved, the Bolivian Air Force and defendants entered into an agreement on or about April 27, 1982 ("1982 contract") supplementing the 1981

contract and modifying some of the original provisions (exhibits D and E, Joint Pretrial Order). However, like the 1981 contract, the 1982 agreement specifically retained the condition that the contract would not become effective unless and until the transfer license was issued, and also stipulated that the promissory notes delivered to defendants must be returned should the transfer license not be issued.

As of June 28, 1983, the position of the United States Government relative to granting a transfer license had not changed. Thus, following inquiries by the Bolivian Comptroller General, the State Department reaffirmed its decision that it would not authorize transfer of the Belgian aircraft to Bolivia; and on that very date, June 28, 1983, the Honorable Edwin G. Corr, United States Ambassador to Bolivia, wrote to the Comptroller General of Bolivia:

> [D]uring conversations in 1981 between the United States Government and the Belgian Government, the Government of the United States indicated that it would not give its authorization for the transfer to the Bolivian Air Force of 52 F–104 airplanes, owned by the Belgian Air Force, in accordance with our arms Export Control Law. On several occasions previous to March 23, 1982, the Department of State conveyed verbally this decision also to Mr. Bernard L. Tractman, Manager of International Promotions and Ventures Limited.
>
> To date, there is no reason to modify this judgment and my Government does not deem it feasible to grant the authorization requested of us. [Exhibit G, Joint Pretrial Order.]

After receipt of Ambassador Corr's June 1983 letter, plaintiffs requested that defendants return the promissory notes in their possession. Similar requests were made to the Belgian Government and defendants' Bolivian agents, which had also been given several of the notes. In due course, nineteen of the notes (December

---

**3.** In 1981 and 1982 Ambassador Hart was the Director of the Office of Andean Affairs, Bureau of Inter-American Affairs, in the Department of State of the United States Government.

notes 1–11 and 13–20) were returned by Belgium and defendants' Bolivian agents. Prior to filing the complaint in this action, plaintiffs demanded from IPVL and Tractman the return of December notes No. 12 and Nos. 21 through 40 ("outstanding notes"), but defendants refused to return those notes. The principal value of the outstanding notes totals $33.01 million.

Essentialy, then, no transfer license for the Belgian Starfighters in question has been issued by the United States Government, and no Starfighters or any of the related goods and services called for by the contracts have ever been provided to the Bolivian Air Force under the 1981 or 1982 contracts.

As of October 1982, IPVL and Tractman had possession of the outstanding notes. This action was commenced in October 1983. On April 5, 1984 Judge Ward enjoined defendants "from negotiating any of the promissory notes that are the subject of this litigation without a further order of this court". Seven days later, on April 12, 1984, defendants' counsel wrote to Judge Ward (exhibit 5, plaintiffs' Notice of Motion) revealing to the court—for the first time—that defendants no longer had possession of the outstanding notes. At that point, Judge Ward was informed by defendants' counsel that in October 1982 defendants had pledged the outstanding notes to secure loans to defendants, and that the pledgee would not release the notes to defendants until the loans had been repaid. Since April 1984, defendants have maintained that the notes are not within their possession or control.

During pretrial discovery, Tractman refused to answer "any and all questions" on the ground that in October 1983, he was subpoenaed to testify before and produce documents to a Federal Grand Jury sitting in Washington, D.C., and that answering any questions in this civil action might tend to incriminate him in violation of his rights under the Fifth Amendment to the United

States Constitution. After being directed by Judge Ward to respond to inquiries relating to the authenticity or admissibility of documents, Tractman (on behalf of IPVL) complied. But IPVL and Tractman have persistently refused to identify the person or entity to whom the outstanding notes were pledged, or to reveal the present holder of such notes, based upon Tractmans' assertion of his Fifth Amendment rights.

On March 25, 1985 this court[4] granted plaintiffs' motion for leave to file an amended and supplemental complaint, seeking recovery of damages equal to the face amount of the outstanding notes for tortious conversion and breach of contract in the event that defendants cannot comply with a judgment ordering return of the notes.

## Opinion

### I.

There is no dispute in this case that both the 1981 and 1982 contracts were subject to the condition that a transfer license be issued by the United States Government; and it is also undisputed that the United States has refused to grant such license. Under paragraph Ninth of the 1981 agreement, the "SELLER" (IPVL) was explicitly obligated to obtain the transfer license within thirty days of the execution of the contract. The 1982 agreement, which amended and supplemented the 1981 contract, did not relieve IPVL of that obligation, but on the contrary recites "[t]hat such license has been in process by "THE SELLER" [IPVL]—with the cooperation of the Bolivian Air Force before the Government of the United States through the official channels". Although the 1981 contract imposed a thirty-day deadline for obtaining the transfer license, the 1982 agreement eliminated that deadline. Still, the issuance of the transfer license was expressly retained as a condition precedent to the parties' contractual obligations. Indeed, the

---

**4.** The within case was reassigned from Judge Ward to the writer by order filed on January 14, 1985.

transfer license is characterized by the 1982 agreement as its "sine qua non".

■ Fundamentally, the parties to a contract may condition the performance of either party, or the validity of the entire contract itself, on the occurrence of an event. *Restatement of Contracts (Second)* § 224 (1979); 3A *Corbin on Contracts* §§ 626–28 (1960). If that event does not occur, the contractual obligation does not arise. *Restatement, supra,* § 225.

■ Here, the 1981 and 1982 contracts are definitively conditioned upon the State Department's issuance of the transfer license. Since such event never occurred, plaintiffs' duty to perform was discharged. Under these circumstances, plaintiffs are entitled to return of the outstanding notes.

A party whose duty of performance ... is discharged as a result of impracticability of performance, frustration of purpose, [or] non-occurrence of a condition ... is entitled to restitution for any benefit that he has conferred on the other party by way of part performance.... *Restatement of Contracts (Second)* § 377 (1979). *See also* 6 *Corbin* § 1368 (1962).

■ Defendants assert, as an affirmative defense and counterclaim, that the official of the Central Bank who executed the letters of guarantee accompanying the original September notes deliberately distorted his signature on those guarantees, thereby rendering the September notes nonnegotiable. However, pursuant to paragraph Thirtieth, quoted *supra*, it is clear that defendants had no right whatever to negotiate the promissory notes prior to obtaining the transfer license. Significantly, the parties had agreed that if defendants failed to obtain the license, the promissory notes and letters of guarantee "will become ipso-facto null of full right

and therefore without any legal value, [and] 'THE SELLER' [defendants] should return them to 'LA FAB' [Bolivian Air Force] within a period of three days."

In any event, there is no dispute that shortly after defendants complained to the Bolivian officials about the form of the signatures on the letters of guarantee accompanying the September notes, plaintiffs issued and defendants accepted replacement notes (December notes), the validity of which is not in issue.

Additionally, defendants' affirmative defense and counterclaims predicated upon the unacceptable letters of guarantee accompanying the September notes, must as a matter of law fail inasmuch as defendants' difficulties in attempting to negotiate the September notes has no bearing on the vital condition in the 1981 and 1982 contracts that a transfer license be issued by the United States Government and the State Department's refusal to issue such license. Plainly, it was defendants' failure to obtain the transfer license that precluded performance of the contracts and not the letters of guarantee accompanying the September notes.

■ Defendants also raise as an affirmative defense plaintiffs' alleged refusal to cooperate with defendants' attempt to negotiate the December notes in June 1982.[5] Again, this defense is legally insufficient. After the United States Government communicated its decision that no transfer license would be issued, defendants were required by the terms of the 1981 and 1982 contracts to return the promissory notes to plaintiffs. Absent the issuance of a transfer license, defendants had no right to negotiate the notes. Moreover, the Central Bank's refusal in June 1982 to acknowledge the validity of the guarantees on the December notes had no causal relevance to the United States policy opposing arms

---

5. Tractman's affidavit in opposition to plaintiffs' motion for summary judgment states that in June 1982, in reply to inquiries from Citibank, the Central Bank declined to acknowledge the validity of the guarantees on ten of the replacement December notes. This averment does not appear disputed by plaintiffs. As Comptroller

General de Lozada's deposition testimony makes clear, the Central Bank refused to acknowledge its guarantee of the notes because "by then [we] knew very well the U.S. position, that there will never be the authorization" required before the notes could be negotiated. Tractman affidavit, exhibit H, at p. 335.

sales to Bolivia, announced many months earlier, and the rejection of Bolivia's request for a transfer license.

■ Defendants further assert as an affirmative defense that the Government of Bolivia refused to cooperate with defendants in attempting to obtain a transfer license, and consequently interfered with defendants' performance under the contracts. The court finds this defense to be utterly without legal merit or factual foundation.

The Hart and Corr communications (exhibits C and G to the Joint Pretrial Order) and the parties' stipulated facts make it abundantly clear that the Bolivian Government did engage in formal government to government—indeed, face to face—dialogue with United States representatives on the subject of a transfer license. It is also noted that the 1982 contract recites as an historical fact, in the section entitled "Background", that the transfer "license is being processed by 'THE SELLER' [*viz.*, IPVL] *with the cooperation of the Bolivian Air Force* before the Government of the United States through the official channels" (emphasis added).

The contracts, however, are completely silent as to what specific steps, if any, the Bolivian Government was required to take in cooperation with defendants to obtain a transfer license. Contrary to defendants' assertion, plaintiffs were not contractually obligated to "formally" request that the United States lift its arms embargo against Bolivia.

In any case, there is nothing in the record to suggest that the State Department's refusal to lift the arms embargo against Bolivia and issue a transfer license was due to any failure by the Government of Bolivia to make a "formal" request, or that a formal request would have altered the State Department's decision. The record is crystal clear that the State De-

partment would not have granted a transfer license even if a formal request was made, and that the reason the license was not issued was the Reagan Administration's unalterably firm unwillingness to issue such license.

Lastly, there is not a scintilla of evidence that the Bolivian Government obstructed defendants' efforts in obtaining the license nor deterred the State Department from issuing a transfer license. The fact that defendants' failure to obtain the transfer license was due entirely to the United States Government's policy respecting arms sales to Bolivia and not to any lack of cooperation by plaintiffs is irrefutable.

Significantly, too, Mr. Tractman's averments in his opposing affidavit concerning Bolivia's alleged lack of cooperation are not based upon personal knowledge, but rather on inadmissible hearsay, which may not be considered as a basis for defeating a motion for summary judgment. Rule 56(e) requires, on a motion for summary judgment: "opposing affidavits shall be made on *personal knowledge,* shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein" (emphasis added).

Finally, Tractman's contention that "[t]he United States stands ready to lift the embargo and issue a transfer license" today, if only Bolivia would make the "appropriate request" (affidavit, paragraph 26, p. 34) is purely surmise and conjecture, which is insufficient to deny a motion for summary judgment. *Cf. Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). Obviously, Tractman cannot speak for the State Department.[6]

In sum, the court concludes that defendants were required by the express terms of the 1981 and 1982 contracts to return December notes 12 and 21 through 40 to plaintiffs since the United States Govern-

---

6. And with reference to the extensive affidavit submitted by Mr. Tractman, the court must agree with plaintiffs' characterization that in the main the affidavit is "scurrilous in the extreme". Tractman's affidavit is replete with personal at-

tacks on United States and Bolivian governmental officials and others comprising unsubstantiated accusations of perjury, corruption, extortion, solicitation of bribery and common thuggery.

ment would not issue a transfer license authorizing the sale of the Starfighters to Bolivia, a condition precedent to the 1981 and 1982 contracts. Inasmuch as there was no relationship between the unacceptable letters of guarantee accompanying the September notes and the decision of the United States Government, for policy reasons, not to issue a transfer license, the court finds no genuine or material issue of fact for trial arising out of defendants first and second counterclaims for breach of contract and fraudulent misrepresentation.[7] Further, as previously pointed out, plaintiffs issued and defendants accepted the December notes, thus curing any defect in plaintiffs' compliance with the 1981 contract. In view of the foregoing, it is unnecessary to reach plaintiffs' contention that the counterclaims must be dismissed as a matter of law because Tractman refused to waive his Fifth Amendment privilege and provide discovery necessary to plaintiffs' defense to the counterclaims. For the reasons stated above, the court also finds no merit in, or genuine issue of fact for trial relating to, defendants' affirmative defense that plaintiffs' refused to cooperate in procuring the transfer license.

## II.

As mentioned *supra*, defendants presently do not have possession of the outstanding promissory notes as they were pledged to an undisclosed third party to secure loans to Mr. Tractman.[8] The court reiterates that until a transfer license was issued, defendants had no right under the 1981 or 1982 contracts to dispose of the notes, and because no transfer license was ever obtained, defendants are required by the contracts to return the notes to plaintiffs. More, plaintiffs are quite correct in their contention that even if plaintiffs had breached the contracts, defendant still would not necessarily be entitled to retain all the outstanding notes, having a face amount of $33.01 million. Indeed, even a "party in breach is entitled to restitution for any benefit that he has conferred by way of part performance * * * in excess of the loss that he has caused by his own breach". *Restatement of Contracts (Second)* § 374(1).

Turning to the question of damages for defendants' breach of contract and conversion of the outstanding promissory notes in the event that defendants are unable to return the notes, plaintiffs claim that defendants must pay an amount equal to the face value of the notes ($33.01 million) plus accrued interest. "The law is well settled that where one converts a note to his own use the measure of damages is prima facie the face value of the note, and it devolves upon the defendant to show that it was in fact of less value." *Allied Building Credits, Inc. v. Grogan Bldrs. Sup. Co.*, 365 S.W.2d 692 (1963). The same measure of damages is applicable where a plaintiff's cause of action is predicated on breach of contract. *Id.*, 365 S.W.2d at 696.

 While defendants assuredly had the right to adduce evidence that the outstanding notes are worth less than their face value, or are without any value, they submitted no evidence whatever concerning the value of the notes. Admittedly, defendants pledged the notes as security for loans. Moreover, the outstanding notes may be further transferred to a new holder who may seek payment of the notes. There is a presumption that the maker of a note will voluntarily pay it or will be compelled to pay it, and consequently its value is prima facie that which appears on its face. *Fourth National Bank v. Dyer*, 350 P.2d 481, 85 ALR 2d 1345 (1960); *Thayer v. Manley*, 73 N.Y. 305 (1878). Plaintiffs need not establish that they have paid the notes to the holder; it is sufficient that

---

**7.** At oral argument held on September 25, 1984, Judge Ward dismissed defendants' third and fourth counterclaims and defendants' counsel voluntarily withdrew defendants' fifth, sixth and seventh counterclaims (exhibit 6 to plaintiffs' Notice of Motion).

**8.** There is no dispute that the December notes are negotiable promissory notes and bear the guarantee of the Central Bank of Bolivia on their faces. Stipulated fact No. 20, Joint Pre-trial Order.

plaintiffs are legally liable for payment of the ·notes. *Thayer v. Manley, supra; Decker v. Mathews,* 12 N.Y. 313 (1855). *See also M.E.R. Co. v. Kneeland,* 120 N.Y. 134, 24 N.E. 381 (1890) and cases cited; *Farnham v. Benedict,* 107 N.Y. 159, 174, 13 N.E. 784 (1887). If defendants are unable (or unwilling) to return the outstanding notes, absent any showing by defendants that the outstanding notes are worth less than face value or are of no value, plaintiffs are entitled to recover as damages the face amount of the notes ($33.01 million) plus accrued interest. *Decker v. Mathews, supra. Thayer v. Manley, supra. See also Western Railroad Co. v. Bayne,* 75 N.Y. 1 (1978); and *Booth v. Powers,* 56 N.Y. 22 (1874).

Finally, defendants' contention that plaintiffs cannot recover as damages the face value of the notes because they have not reached maturity is without merit. In *Hubbard v. State Life Ins. Co. of Indianapolis, Ind.,* 129 Iowa 13, 105 N.W. 332 (1905), defendant's agent converted and negotiated before maturity a promissory note that was delivered to him by plaintiff pursuant to negotiations for a contract that was not yet binding on either party and plaintiff had the right to recall the note. As to the measure of damages, the *Hubbard* court held that inasmuch as it appeared that the note was negotiated before maturity by defendant's agent (to whom it was made payable), and was an outstanding obligation of plaintiff in the hands of an innocent holder, "there can be no doubt of plaintiff's right to recover by way of damages the face value of the outstanding obligation" (105 N.W. at 333).

*Conclusion*

In summary, plaintiffs have presented an unassailable and uncontradicted case on the facts—a devastating case, to be blunt; defendants have interposed merely some sham and feigned defenses and counterclaims—patently inadequate and inapplicable—which do not raise any justiciable or arguable issue of material fact. Accordingly, the court concludes that plaintiffs'

application must be granted; and that summary judgment, an effective arm in the arsenal of judicial economy, is entirely appropriate to obviate the necessity of a trial.

For the foregoing reasons, it is hereby ORDERED:

1) Plaintiffs' motion for summary judgment dismissing defendants' first and second counterclaims for breach of contract and fraudulent misrepresentation is granted.

2) Plaintiffs' motion for summary judgment for restitution of the outstanding December notes is granted; said notes shall be returned to plaintiffs within twenty days of this order.

3) In the event that defendants are unable or unwilling to return the outstanding December notes to plaintiffs in accordance with paragraph 2, *supra,* plaintiffs are granted summary judgment for damages in the amount of $33.01 million dollars, the face amount of the outstanding notes, plus the accrued interest.