David **SHAPIRO**, Plaintiff–Appellant,

v.

The **REPUBLIC OF BOLIVIA**, the Bolivian Air Force and the Central Bank of Bolivia, Defendants–Appellees.

No. 822, Docket 90–7752.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1991.

Decided April 17, 1991.

Anthony V. Labozetta, New York City (Lisa M. Sheppard, New York City, of counsel), for plaintiff-appellant.

Mitchell A. Karlan, New York City (Dvora Wolff Rabino, Gibson, Dunn & Crutcher, New York City, of counsel), for defendants-appellees.

Before WINTER and ALTIMARI, Circuit Judges, and WEXLER, District Judge.*

WINTER, Circuit Judge:

The subject of the instant action is a negotiable promissory note issued by the Republic of Bolivia to a United States corporation and introduced into the United States. The note is now in the hands of a United States citizen living in Hong Kong who has sought payment on the note from Bolivia but has been refused. We hold that Bolivia is subject to suit on the note in United States courts under the "commercial activity" exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), and reverse.

## BACKGROUND

Bernard Larry Tractman is president and sole shareholder of International Promotions and Ventures, Ltd. ("IPVL"), a Delaware corporation with its principal place of business in New York City. Tract-

---

* The Hon. Leonard D. Wexler, United States District Judge for the Eastern District of New York, sitting by designation.

man individually, and later collectively with IPVL, registered with the United States Department of Justice as an agent of the Republic of Bolivia engaged in various business and political activities, including negotiations for the purchase by the Bolivian Air Force of certain used NATO aircraft. The aircraft in question were F–104 Starfighter jets manufactured in the United States and owned by the Government of Belgium. The sale of these jets was subject to approval by the United States Department of State. *See* 22 C.F.R. § 123.10 (1990).

In September 1981, IPVL and the Bolivian Air Force entered into a contract ("Contract") pursuant to which IPVL agreed to supply fifty-two such Starfighters and related equipment and services in exchange for negotiable promissory notes guaranteed by the Central Bank of Bolivia. Although Bolivia was required to issue the notes upon execution of the Contract, the Contract expressly required IPVL to return the notes if the United States authorities failed to approve the transfer of the aircraft.

In December 1981, pursuant to the Contract, Bolivia issued a series of negotiable promissory notes ("Notes"), numbered 1 through 40, with a face value of nearly $81 million.[1] Notes 1 through 10 were issued to Belgium. Notes 11 through 40 were issued to IPVL. IPVL received some of these Notes in Bolivia, and others, including Note 12, were sent directly to the United States. The State Department, however, refused to issue the necessary transfer license, and by mid–1983 the Starfighters remained undelivered. Upon Bolivia's request, Belgium returned Notes 1 through 10, and IPVL's Bolivian agent returned Note 11 and Notes 13 through 20. IPVL refused to return Note 12 and Notes 21 through 40.

The Republic of Bolivia thereafter brought an action in the Southern District of New York against Tractman and IPVL to recover possession of the outstanding Notes, or, alternatively, to recover damages. In September 1985, Judge Bernard Newman[2] granted Bolivia's motion for summary judgment and ordered IPVL and Tractman to return Note 12 and Notes 21 through 40, or, if "unable or unwilling" to do so, to pay damages in the amount of $33.01 million, the face amount of the Notes, plus accrued interest. *See Office of the Comptroller General v. International Promotions and Ventures, Ltd., ("IPVL"),* 618 F.Supp. 202 (S.D.N.Y.1985).

In June 1986, having failed to return any of the outstanding Notes or to pay any part of the *IPVL* judgment, Tractman and IPVL filed petitions for bankruptcy, resulting in an ongoing Chapter 7 proceeding in the Southern District bankruptcy court. In September 1986, Bolivia commenced an adversary proceeding in the bankruptcy action, seeking recovery of the outstanding Notes and denial of Tractman's request for discharge of the *IPVL* judgment. The bankruptcy court denied Bolivia's application. An appeal is pending.

In December 1986, David Shapiro filed this action in the Southern District against the Republic of Bolivia, the Bolivian Air Force, and the Central Bank of Bolivia. He alleges that he holds Note 12 and was refused payment on it by the Central Bank and seeks as relief the face value of the Note—$1,426,000—plus accrued interest. Shapiro is a United States citizen who resides primarily in Hong Kong but also maintains a residence in New York City. He is a director of Attlee Investments, Ltd. ("Attlee"), a Hong Kong corporation that organizes joint ventures and transactions in commercial paper and various commodities.

How Shapiro obtained Note 12 is a matter of controversy. His affidavit states the following. In March 1982, IPVL engaged Attlee to locate a purchaser for Notes 21

---

1. Previously, in September 1981, Bolivia had issued twenty-one promissory notes in the amount required by the Contract, but defective signatures on the letters of guarantee accompanying the notes rendered them nonnegotiable. These original notes were returned and destroyed. *See Office of the Comptroller General v. International Promotions and Ventures, Ltd.,* 618 F.Supp. 202, 204 (S.D.N.Y.1985).

2. Judge of the Court of International Trade, sitting by designation.

through 40 in exchange for a commission. Attlee found a willing buyer but in May 1982 the deal collapsed and IPVL refused to pay a commission to Attlee. Subsequently, a creditor of IPVL, Cesar Sison, took possession of Notes 21 through 40 as collateral for outstanding loans. In September 1983, Sison sought Attlee's help in selling those Notes, and, "in or about the end of October, 1983"—the same month in which the *IPVL* action was commenced, *see* 618 F.Supp. at 206—Sison transferred another Note, number 12, to Attlee as its commission for having found the willing buyer in 1982.[3] Ultimately, Shapiro personally "purchased" Note 12 from Attlee in August 1986—almost one year after Judge Newman ordered IPVL and Tractman to return the Notes—in exchange for cancelling Attlee's debt to him in the amount of $117,450.

Before discovery, appellees, who deny any knowledge of how Shapiro obtained Note 12, moved to dismiss the complaint on the grounds that the district court lacked subject matter and personal jurisdiction and on the ground of *forum non conveniens*. The parties submitted affidavits, and Judge Lowe referred the matter to a magistrate, who recommended that the motion be denied. *See Shapiro v. Republic of Bolivia*, No. 86 Civ. 9935 (MJL) (S.D.N.Y. Aug. 31, 1989) (report and recommendation of Magistrate Roberts). Judge Lowe disagreed, holding that under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1332(a)(2)–(4), 1441(d), and 1602–11 (1988), appellees are immune from the jurisdiction of the courts of the United States in this matter. She ruled that appellees had neither waived their immunity pursuant to 28 U.S.C. § 1605(a)(1) by initiating the *IPVL* suit and the subsequent bankruptcy adversary proceeding nor engaged in such "commercial activity carried on in the United States" as would subject them to jurisdiction under 28 U.S.C. § 1605(a)(2). *See Shapiro v. Republic of Bolivia*, No. 86 Civ. 9935 (MJL), 1990 WL 100908 (S.D.N.Y. July 9, 1990) (opinion and order). Accord-

ingly, on July 25, 1990, the district court entered a judgment dismissing the complaint, from which Shapiro has appealed.

While we agree that appellees have not waived their sovereign immunity pursuant to Section 1605(a)(1), we find that they have carried on "commercial activity" sufficiently related to the United States to subject them to jurisdiction under Section 1605(a)(2). We thus reverse.

## DISCUSSION

The sole issue before us is whether Bolivia, as a foreign sovereign, is immune from the jurisdiction of United States courts. The merits of the underlying action, and in particular whether Shapiro can surmount the formidable hurdle presented by the claim that he is not a bona fide purchaser of Note 12, are not before us.

### A. Standard of Review

█ The parties disagree over the appropriate scope of appellate review. Appellees urge that the district court's conclusions that (1) Bolivia did not waive its sovereign immunity by bringing actions against IPVL and Tractman and that (2) Bolivia did not engage in sufficient commercial activity to invoke the jurisdiction of United States courts are findings of fact subject to the "clearly erroneous" standard of review set forth by Fed.R.Civ.P. 52(a). Appellant counters that these conclusions are matters of law subject to *de novo* review.

We agree with appellant that in the circumstances of the instant matter *de novo* review is proper. Had the district court made factual findings, our review of those findings would be under the clearly erroneous standard. However, the district court made no such findings. It merely took account of Bolivia's two prior actions against IPVL and Tractman and, as was proper in this procedural context, deemed as true Shapiro's allegations concerning the issuance and distribution of the Notes. *See Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 706 (2d Cir.), *cert. denied*, 437

---

**3.** Shapiro alleges that Attlee itself eventually purchased Notes 21 through 40 and continues to hold them.

U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978). The core of the district court's decision is the essentially legal question of whether appellees' actions, as alleged, have triggered an exception to the general rule of foreign sovereign immunity. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981) (conducting *de novo* review of dismissal on sovereign immunity grounds), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

**B.** *Subject Matter Jurisdiction*

■ The FSIA is the exclusive source of subject matter jurisdiction in suits involving foreign states. *See Morel de Letelier v. Republic of Chile,* 748 F.2d 790, 793 (2d Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). It confers original jurisdiction on district courts

> without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity....

28 U.S.C. § 1330(a). In turn, 28 U.S.C. § 1604 establishes the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States ... except as provided in sections 1605 to 1607 of this chapter."

It is undisputed that appellees constitute a "foreign state" within the meaning of the FSIA. *See* 28 U.S.C. § 1603(a). Thus, unless one of the statutory exceptions applies, a federal court is without subject matter jurisdiction to hear the instant action. The two exceptions relevant to this appeal are codified at 28 U.S.C. § 1605(a)(1) and (2):

> A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case—
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication ...
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

1. The "waiver" exception

■ We agree with the district court that appellees did not waive their sovereign immunity by bringing the actions against Tractman and IPVL. Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly. *See, e.g., Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 444 (D.C.Cir.1990); *Joseph v. Office of the Consulate General,* 830 F.2d 1018, 1022 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); *Frolova v. USSR,* 761 F.2d 370, 377 (7th Cir.1985); *L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 123 (S.D.N.Y.1988). This approach is derived from the legislative history of the FSIA, in which Congress specified three examples of implied waiver. The House Report thus states:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6617. These examples involve circumstances in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous.

Appellant asks us to extend the implied waiver doctrine and hold that a suit by a foreign sovereign in a United States court with respect to a particular matter constitutes a waiver of immunity from jurisdiction as to associated claims. *See Colonial*

*Bank v. Compagnie Generale Maritime et Financiere,* 645 F.Supp. 1457, 1461–63 (S.D.N.Y.1986); *In re Oil Spill by the Amoco Cadiz,* 491 F.Supp. 161, 166–68 (N.D.Ill.1979). We have never recognized such an extension, and, even if we were inclined to do so, the extension would not encompass the circumstances of the instant matter. Although Bolivia's two prior actions involved the Notes, those actions are distinct from the instant litigation. *IPVL* was a breach of contract action to decide the mutual rights and obligations of Bolivia and IPVL under the 1981 Contract. *IPVL* held that because IPVL failed to deliver the Starfighters, it was obligated to return the outstanding Notes to Bolivia or pay damages. *See* 618 F.Supp. at 209–10. The instant action involves a different set of rights and obligations, namely, those of Bolivia and the holder of one of its promissory notes. In *IPVL,* the Contract was the source of the rights and duties, and return of the Notes was an alternative form of relief. In this action, Note 12 is the source of the rights and duties, and a cash payment is the relief sought. Thus, the common element—the Notes—is actually only a superficial source of relatedness. *See Colonial Bank,* 645 F.Supp. at 1462.

Indeed, Shapiro's claim to be a bona fide purchaser entitled to enforce the terms of Note 12 notwithstanding the *IPVL* judgment precisely illustrates the distinction between that action and the instant matter. Similarly, in the bankruptcy adversary proceeding, Bolivia seeks to protect its judgment against IPVL and Tractman, rather than to determine the rights of any Noteholder. Even if we were to recognize an implied waiver of sovereign immunity for prosecuting related litigation, therefore, this is not the case in which to do so.[4]

2. The "Commercial Activity" Exception

The second relevant exception to sovereign immunity under the FSIA subjects a foreign state to the jurisdiction of United States courts as to an action based upon its commercial activity, if such activity relates to the United States in one of the ways delineated by the three clauses of 28 U.S.C. § 1605(a)(2). *See supra.* The clause applicable to the instant matter creates subject matter jurisdiction in an action "based upon a commercial activity carried on in the United States by the foreign state."[5] *Id.* The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," 28 U.S.C. § 1603(d), and defines "commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United States," 28 U.S.C. § 1603(e).

We have read the first clause of Section 1605(a)(2) to focus not on whether the foreign state generally engages in commercial activity in the United States, but on whether the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States. *See Ministry of Supply v. Universe Tankships, Inc.,* 708 F.2d 80, 84 (2d Cir.1983); *Colonial Bank,* 645 F.Supp. at 1463; *see also America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989) ("[t]here must be a nexus between the defendant's commercial activity in the United States and the plaintiff's grievance").

■ Appellant's claim is for payment on Note 12. Thus, the overall activity giving rise to this claim is the issuance of the Notes to IPVL. It is self-evident that issuing public debt is a commercial activity within the meaning of Section 1605(a)(2). *See Carl Marks & Co. v. USSR,* 841 F.2d 26, 27 (2d Cir.) (per curiam) (bearer bonds and credit participation certificates of Rus-

---

4. Apparently, the single case that has extended the doctrine of implied waiver to include a foreign state's conduct beyond the suit at issue, *In Re Oil Spill,* did so in the context of multi-district litigation involving suits between the same parties. *See* 491 F.Supp. at 167. Courts have otherwise been loathe to find an implied waiver with respect to suits brought by a third party. *See Frolova,* 761 F.2d at 377.

5. Because we find jurisdiction under the first clause of Section 1605(a)(2) we need not address the applicability of the other clauses.

sian Imperial Government), *cert. denied,* 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988); *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 825 (9th Cir.) (certificates of deposit issued by Mexican national banks), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987); *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1469–70 (S.D.N.Y.1984) (same), *aff'd,* 762 F.2d 222 (2d Cir.1985); *Allied Bank Int'l v. Banco Credito Agricola,* 566 F.Supp. 1440, 1443 (S.D.N.Y.1983) (promissory notes executed by Costa Rican national bank), *rev'd on other grounds,* 757 F.2d 516 (2d Cir.), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985); *see also* House Report at 10, 17, *reprinted at* 6609, 6615–16 (including indebtedness incurred by a foreign state as commercial activity). Thus, the critical question is whether Bolivia's issuance of the Notes to IPVL and their transportation to this country constituted "substantial contact" with the United States. We find that it did.

Congress left it to the courts to define the contours of "substantial contact" between a foreign state's commercial activity and the United States. *See* House Report at 17, *reprinted at* 6616. However, it is clear that Congress intended a tighter nexus than the "minimum contacts" standard for due process. *See Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1109 (D.C.Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1296 (S.D.N.Y.1980), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *see also* House Report at 17, *reprinted at* 6616 (definition "intended to reflect a degree of contact beyond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff").

Although caselaw giving content to the term "substantial contact" is scant, *see, e.g., Maritime,* 693 F.2d at 1109 n. 24, appellees' activities, as alleged in the complaint and affidavits in opposition to the motion to dismiss, satisfy that standard. Appellees issued the Notes to IPVL, a De-

laware corporation doing business principally in New York City. Note 12 and Notes 21 through 30 physically traveled to the United States and were placed in escrow for IPVL with a Washington, D.C. law firm. At this time, IPVL and Tractman were registered agents of the Government of Bolivia, in part for the purpose of arranging financing to purchase the Starfighters for that client. Although IPVL was obligated to return the Notes if the Starfighters were not delivered, the Notes were fully negotiable instruments on which Bolivia would be liable to any holder in due course. *See IPVL,* 618 F.Supp. at 209–10.

The activity in question thus introduced negotiable promissory notes into the United States for the purpose of raising capital. There was no attempt to prevent IPVL from seeking to distribute the Notes in the United States apart from the Contract which did not purport to limit where the Notes might be discounted and the terms of which were, in any event, not on the Notes. At this stage of the litigation, the particular circumstances surrounding Shapiro's acquisition of Note 12 are irrelevant. The issue, rather, is the nature of the activity engaged in by Bolivia, namely, raising capital by introducing negotiable promissory notes into the United States. We know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA. The very presence of such highly transferable instruments, whether or not the initial holder successfully discounts them in the country, suffices to satisfy the "substantial contact" requirement of the statute. The United States has a strong interest in capital-raising activities within its borders. This interest is amply illustrated by the fact that, absent a statutory exemption, federal securities law prohibits the issuance or sale of securities before an effective registration of such securities with the Securities and Exchange Commission. *See* Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1988). In light of this established policy of pre-clearance, it would be entirely anomalous for us to read

the FSIA as not including the introduction of bearer notes into the United States as commercial activity having substantial contact with the United States.[6] Whether the Notes were ultimately discounted in the United States or found their way elsewhere does not, therefore, undermine the conclusion that Bolivia is subject to the jurisdiction of United States courts for the purpose of enforcing the Notes.

To be sure, IPVL was contractually bound to return the Notes in the instant matter, and thus acted contrary to the Contract in marketing them. However, the Notes were fully negotiable. Bolivia thus undertook to bear the risk that IPVL would transfer them prematurely or would not be able to respond to a judgment in the amount of the outstanding Notes. Had Bolivia desired to protect itself against wrongful conduct by IPVL, it could have placed restrictions on the negotiability of the Notes. It chose not to do so, no doubt because such restrictions would diminish the Notes' usefulness for raising capital.

Accordingly, we thus find that the appellees' placement of Note 12 with IPVL constituted a "commercial activity ... having substantial contact with the United States." 28 U.S.C. § 1603(e). The instant action is therefore "based upon a commercial activity carried on in the United States by [a] foreign state," 28 U.S.C. § 1605(a)(2), over which the district court has subject matter jurisdiction.

C. *Personal Jurisdiction*

■ We next turn to whether the district court may exercise personal jurisdiction over appellees. The FSIA, 28 U.S.C. § 1330(b), provides: "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." Under the FSIA, therefore, personal jurisdiction

equals subject matter jurisdiction plus valid service of process. *See Texas Trading,* 647 F.2d at 308.

■ There is of course a constitutional constraint on the assertion of personal jurisdiction. There must be sufficient "minimum contacts" between the foreign state and the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *see Texas Trading,* 647 F.2d at 314. As noted, the "substantial contact" standard for subject matter jurisdiction under the commercial activity exception of Section 1605(a)(2) requires a closer nexus than the "minimum contacts" necessary for due process. Thus, for largely the same reasons as we found subject matter jurisdiction, we find that the connections between appellees and the Southern District are constitutionally sufficient to support a finding of personal jurisdiction. Nor do we find unusual inconvenience to appellees in litigating this matter in the United States. This action is a commercial lawsuit of a kind that foreign parties regularly conduct in our courts. Finally, as noted above, the United States has a strong interest in capital transactions by foreign sovereigns conducted through United States intermediaries. For these reasons we find no violation of due process in the exercise of personal jurisdiction under Section 1330(b).[7]

## CONCLUSION

For the reasons stated, we hold that the district court has jurisdiction over the instant action. We thus reverse.

---

**6.** At oral argument, counsel for Bolivia asserted his view that the Notes were not securities within the meaning of the federal securities laws. We need not address that question because we rely on those laws solely as evidence of the substantial interest of the United States in the

presence of negotiable financial instruments in this country.

**7.** Similarly, we reject appellees' argument that dismissal is appropriate on the ground of *forum non conveniens.*