**In the Matter of The Complaint of RIO GRANDE TRANSPORT, INC., as owner of S. S. YELLOWSTONE, for exoneration from or limitation of liability.**

**In the Matter of The Complaint of COMPAGNIE NATIONALE ALGERIENNE DE NAVIGATION, as owner of the Motorvessel IBN BATOUTA, for exoneration from or limitation of liability.**

Nos. 78 Civ. 2702, 78 Civ. 5972.

United States District Court,
S. D. New York.

June 19, 1981.

---

Joseph C. Smith, Robert B. Pohl, Terry L. Stoltz, Burlingham Underwood & Lord, New York City, for Rio Grande Transport, Inc., plaintiff in 78 Civ. 2702, claimant in 78 Civ. 5972.

Richard H. Brown, Jr., Paul F. McGuire, Kirlin, Campbell & Keating, New York City, for Compagnie Nationale Algerienne de Navigation, conditional claimant in 78 Civ. 2702, plaintiff in 78 Civ. 5972.

Arthur Abarbanel, Schulman & Abarbanel, New York City, for claimants Berry, Cotton, Dickinson, Elgahmi, LaDuke, and Smith.

Paul S. Edelman, Kreindler & Kreindler, New York City, for claimants Lane, Stewart, and Karaba.

H. M. Walker, Jr., Geoffrey W. Gill, Robert E. Anderson, Walker & Corsa, New York City, for claimants Embassy of Tunisia and Office National des Cereales.

## OPINION AND ORDER

PIERCE, District Judge.

On June 12, 1978, the S.S. Yellowstone, a ship owned by Rio Grande Transport, Inc. ("Rio Grande"), a New York corporation, carrying a cargo of grain destined for Tunisia, collided in the Mediterranean Sea with the M/V Ibn Batouta, a cargo ship owned by Compagnie Nationale Algerienne de Navigation ("CNAN"). The collision allegedly resulted in the sinking of the Yellowstone, the death of five of her crewmembers, injury to several other crewmembers, the total loss of her cargo, property loss of her crewmembers, and damage to the Ibn Batouta.

On June 13, 1978, Rio Grande filed a complaint pursuant to Rule F of the Supplemental Federal Rules of Procedure for Certain Admiralty and Maritime Claims ("Rule F"), for exoneration from or limitation of liability in connection with the June 12, 1978 collision. (78 Civ. 2702). Rio Grande posted a stipulation of value and, pursuant to orders of the Court and statutory notice, various claims for personal injury, wrongful death, and cargo loss were filed against Rio Grande.[1] On September 15, 1978, CNAN filed a "claim for declaratory judgment" by which it seeks a judgment declaring it immune from jurisdiction of the state and federal courts of the United States, under provisions of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602 et seq., with respect to all claims it anticipated would be filed against it. CNAN also filed a "conditional claim and answer", only to be considered in the event that its sovereign immunity claim is denied. Thereafter, Rio Grande filed a counterclaim against CNAN and all but one

---

1. These claims include three wrongful death claims on behalf of Yellowstone crewmembers (Emily Karaba for William Karaba, Kathleen F. DiNino for Carter Lane, and Anne Marie Shaugnessy for Peter Kenneth Shaugnessy); fourteen personal injury claims by Yellowstone crewmembers (Thomas W. Berry, Samuel Dickinson, Abdulwali Elgahmi, Francis Smith, Jerry LaDuke, Hammond N. Jahafi, Wilbur M. Gee, Paul Aubain, Robert L. Cotton, Joseph Belmonte, Jr., John S. Clark, Henry Kozlowski, Gerald LaMontaine, Mitchell Donald Stewart); one property loss claim by a Yellowstone crewmember (Marcellus Mejaries); a cargo claim by the Embassy of Tunisia and Tunisia's Office National des Cereales; and a "conditional claim" by CNAN for damage to its vessel.

of the claimants filed cross-claims against CNAN.[2]

On December 12, 1978, CNAN filed a complaint pursuant to Rule F for exoneration from or limitation of liability. (78 Civ. 5972). Like its conditional claim filed in 78 Civ. 2702, the Rule F complaint is to be considered only if CNAN's sovereign immunity claim is denied. CNAN posted a stipulation of value and, pursuant to the statutory orders and notice, claims for personal injury, wrongful death, and cargo loss were filed against CNAN. The claimants are substantially identical to those that filed claims against Rio Grande and cross-claims against CNAN in 78 Civ. 2702.[3]

On October 20, 1978, CNAN moved for summary judgment with respect to its claim that it is sovereign immune under the FSIA. By Order dated June 20, 1979, the Court denied CNAN's motion, finding that genuine issues of material fact were present. Thereafter, the Court referred to Magistrate Gershon the supervision of discovery relevant to CNAN's immunity claim. By Order dated September 16, 1978, Rio Grande's action (78 Civ. 2702) and CNAN's action (78 Civ. 5972) were consolidated.

Now before the Court is CNAN's renewed motion for summary judgment with respect to its claim of sovereign immunity. The motion raises apparently novel issues concerning the operation of the FSIA—a relatively new statute—in the peculiar procedural setting of two limitation of liability actions. For the reasons stated below, CNAN's motion for summary judgment is denied.

### Discussion

The general grant of foreign sovereign immunity in the FSIA, 28 U.S.C. § 1604, provides:

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

Simply stated, the Court must first determine whether CNAN is a foreign state and, if so, then determine whether any of the exceptions of the FSIA are applicable.

### I. *CNAN as a Foreign State*

■ In support of its motion, CNAN has submitted an attestation of the Algerian Minister of Transportation and an affidavit of the Algerian Charges D'Affaires of Algeria to the United States (certified by the Deputy Chief of Protocol of the United States Department of State). These documents indicate, *inter alia*, that CNAN is a national corporation of the Republic of Algeria; that the capital of CNAN is provided exclusively by the Republic of Algeria which owns all its shares; and that CNAN was the sole owner of the M/V Ibn Batouta during 1978 and through the present. These documents, uncontraverted by Rio Grande or any claimant, clearly indicate that CNAN is an "agency or instrumentality of a foreign state" as defined by 28 U.S.C. § 1603(b). Accordingly, CNAN is entitled to sovereign immunity unless an exception in the FSIA is applicable.

### II. *Applicability of FSIA Exceptions*

#### A. *Waiver: § 1605(a)(1)*

28 U.S.C. § 1605(a)(1) states:

"A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of

---

**2.** All of the claimants listed in footnote 1, *supra*, filed a cross-claim against CNAN except Mejaries.

**3.** All of the claimants listed in footnote 1, *supra*, filed a claim against CNAN except Belmonte and Mejaries. All of the claims were timely filed, except for those of Clark, Kozlowski, and LaMontaine which were filed after the Court-ordered deadline. In addition to the aforementioned claimants, a wrongful death claim on behalf of George T. Wright (apparently a deceased Yellowstone crewmember) was filed against CNAN.

this waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."

The parties asserting claims against CNAN contend that CNAN's filing a conditional claim and answer in 78 Civ. 2702 and its filing a conditional limitation proceeding (78 Civ. 5972) constitute a waiver of immunity.

■ The Court rules that CNAN's actions, viewed in the peculiar procedural context presented herein, did not constitute a waiver of sovereign immunity. CNAN's conditional claim and its limitation complaint reiterate their conditional nature; both are to be considered only in the event that CNAN's request for a judgment declaring it immune is denied.

CNAN apparently foresaw a scenario in which it would not file a claim, conditional or otherwise, against Rio Grande within the time-period ordered by the Court pursuant to Rule F's mandate. Thereafter, an action could have been initiated against CNAN by Rio Grande (perhaps in the nature of an impleader) or by anyone who had filed a claim against Rio Grande. In such an action, CNAN would have been able to assert a defense of sovereign immunity. However, if its defense was rejected, CNAN would have been subject to the jurisdiction of the United States courts, but its claim against Rio Grande would by then have been time barred under Rule F. As a practical matter, its claim against Rio Grande for hull damage (and perhaps indemnification) would have been lost forever, because the United States is apparently the only forum in which CNAN could obtain jurisdiction over Rio Grande. (Rio Grande's only asset at the time of the collision was the Yellowstone).

Apparently in an effort to avoid the disadvantages of such a sequence, CNAN filed its declaratory judgment claim and a conditional claim to be pursued only if its sovereign immunity defense was rejected. Similarly, in order to preserve its ability to avail itself of the protections of the Shipowner's Limitation of Liability Act, 46 U.S.C. §§ 181 et seq., in the event that its sover-

eign immunity defense was rejected, CNAN filed a "conditional" or "protective" limitation complaint. Pursuant to Rule F, such a complaint must be filed within six months after CNAN's receipt of the first written notice of claim against it. Accordingly, CNAN was compelled to file a limitation proceeding prior to adjudication of its sovereign immunity defense.

CNAN did everything possible to preserve substantive rights it reasonably expected it would lose if its sovereign immunity defense was denied; its actions cannot be considered an express or implied waiver of its sovereign immunity defense. This conclusion is consistent with *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 19–20, 92 S.Ct. 1907, 1918, 32 L.Ed.2d 513 (1972), in which the Supreme Court ruled that a defendant which sought to dismiss a suit brought against it in federal court, on the grounds that the London Court of Justice had exclusive jurisdiction of the dispute pursuant to a contract between the parties did not waive its defense by filing a protective limitation proceeding. Like the defendant in *The Bremen*, CNAN filed a protective limitation proceeding and conditional claim—defensive measures necessary to protect itself.

**B.** *Counterclaim: § 1607*

■ In an argument related to their waiver argument, Rio Grande contends that CNAN's sovereign immunity defense is barred by 28 U.S.C. § 1607(b), which states:

"In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state."

Rio Grande contends that its counterclaim against CNAN in 78 Civ. 2702 is covered by this provision. However, as previously discussed, CNAN has not unconditionally intervened in Rio Grande's limitation proceeding. Rather, it has filed a conditional claim to be considered only in the event its sover-

eign immunity defense is rejected. CNAN's posture is readily distinguishable from the Republic of France's position in *In re Oil Spill by "Amoco Cadiz" Off Coast of France*, 491 F.Supp. 161 (N.D.Ill.1979) in which the Court rejected, on the basis of § 1607, France's sovereign immunity defense. In that case, France had filed an unconditional affirmative action, whereas here CNAN has only filed a conditional claim and limitation proceeding. Thus, CNAN's sovereign immunity defense is not entirely abrogated by § 1607(b).[4]

### C. *Existing International Agreements: § 1604*

The general grant by Congress of sovereign immunity to foreign states provided for in 28 U.S.C. § 1604 is "subject to existing international agreements to which the United States [was] a party at the time of the enactment of [the FSIA]." At the time the FSIA was enacted, the United States was a party to a multilateral agreement known as the Convention on the High Seas Done at Geneva on 29 April 1958 ("Convention on the High Seas"), 450 United Nations Treaty Series 510, *reprinted in* Appendix A to Rio Grande's Brief filed February 6, 1981. Article 9 of that agreement provides:

> "Ships owned or operated by a State and used only on government non-commercial service shall, on the high seas, have complete immunity from the jurisdiction of any state other than the flag state."

While this provision relates solely to non-commercial use of state-owned or operated ships, the governments of Albania, Bulgaria, the Byelorussian SSR, Czechoslovakia, Hungary, Poland, Romania, the Ukranian SSR, and the Union of Soviet Socialist Republics all signed the agreement with the reservation that the immunity in Article 9 should extend to *commercial* service of state-owned vessels. However, the United States signed the Convention with an express objection to the reservations of the above-listed signatories.

■ Rio Grande and the Tunisian claimants contend that such objection by the United States reflected this country's position that state-owned or operated vessels on commercial service should not have immunity from the jurisdiction of other states, and, therefore, CNAN's sovereign immunity claim asserted in this country is barred by the Convention on the High Seas. Putting aside the troublesome fact that the Republic of Algeria was not a party to the Convention, *objections* by the United States to the position of other signatories can hardly be considered part of an international agreement. Accordingly, this Court holds that the "international agreement" caveat of § 1604 does not defeat CNAN's sovereign immunity claim.

### D. *Immovable Property in the United States: § 1605(a)(4)*

■ 28 U.S.C. § 1605(a)(4) provides: "A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case in which ... rights in immovable property situated in the United States are in issue."

Some of the claimants contend that the limitation fund is immovable property. Indeed, the fund, which consists of freight money earned by the Yellowstone on her final voyage, must be maintained in the United States pending the outcome of this case. Nonetheless, the fund does not appear to be the type of immovable property sought to be protected by § 1605(a)(4). The legislative history of § 1605(a)(4) unequivocally indicates that immovable property refers only to real estate. S.Rep.No.94–1310, 94th Cong., 2d Sess. 20 (1976); H.R.Rep.No. 94–1487, 94th Cong., 2d Sess. 20, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6618–19. Thus, CNAN's sovereign immunity claim is not lost by virtue of § 1605(a)(4).

### E. *Commercial Activity: § 1605(a)(2)*

28 U.S.C. § 1605(a)(2), the FSIA "commercial activity" exception, contains three

---

**4.** As discussed *infra* at 1164, the provision does afford a toehold by which the Court has jurisdiction over some of the claims asserted against CNAN.

separate clauses which can defeat a claim of immunity. The claimants contend that the first clause or, alternatively, the third clause is applicable to the case at bar.

### 1. First Clause

The first clause provides:

"A foreign state shall not be immune from the jurisdiction of courts of the United States or of the State in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state."

The claimants assert that this action is based upon CNAN's commercial shipping activities, which are carried on in the United States.

Broadly speaking, CNAN's commercial shipping activities certainly extend to the United States. The parties have stipulated, inter alia, that CNAN's vessels regularly call at United States ports for loading and discharging of commercial cargos for ocean carriage, CNAN earns substantial income for those activities, and CNAN spends substantial moneys in the United States in connection with its shipping activities.[5] Further, CNAN does not dispute the fact that its shipping activities are commercial in nature.

The issue arising under the first clause is the scope to be given to the words "commercial activity". If commercial activity is defined as CNAN's worldwide shipping activities, then the present action can be said to be based upon a commercial activity having substantial contact with the United States. See 28 U.S.C. § 1603(e). On the other hand, if commercial activity is defined as CNAN's operation of the Ibn Batouta on June 12, 1978 (the ship was on a voyage from Algeria to West Germany) or as CNAN's normal operation of the Ibn Batouta (which apparently maintained regular service between Northern European ports and Algeria), then this action is based upon commercial activity apparently having no contact with the United States. In the former case subject matter jurisdiction would be present, while in the latter case it would be lacking.

Under 28 U.S.C. § 1603(d), a "commercial activity" means "either a regular course of

---

**5.** Due to the importance of the stipulated facts, with regard to both subject matter jurisdiction and personal jurisdiction, the full text of the December 22, 1980 Stipulation and Order is set forth in full:

"It is hereby stipulated and agreed, solely for the purpose of determining Compagnie Nationale Algerienne De Navigation's ("CNAN's") claim to immunity under 28 U.S.C. §§ 1331, 1602 et seq. in this matter and in 78 Civ. 5972 (LWP) that CNAN is doing business in the United States by virtue of the following:

"1. CNAN's vessels, either owned or chartered in by it, systematically and regularly call at United States ports for loading and discharging of commercial cargoes for ocean carriage, the majority of which is loaded at United States ports;

"2. CNAN earns a substantial income from this ocean carriage of commercial goods to or from United States ports, the major portion of which is earned with respect to cargoes shipped from United States ports;

"3. CNAN spends substantial moneys in the United States by virtue of its vessels calling at United States ports including repair and maintenance costs for such vessels;

"4. CNAN charters out some of its vessels to the United States companies;

"5. On a systematic and regular basis (including daily in the Journal of Commerce), CNAN advertises its vessels which call at United States ports to solicit commercial cargoes for ocean carriage;

"6. CNAN has appeared as defendant in litigation in the United States arising out of the ocean carriage of commercial goods to and from United States ports without asserting the defense of sovereign immunity.

"7. From September 1977 through December 31, 1978, CNAN was a member of the U.S. South Atlantic/Spanish, Portuguese, Moroccan and Mediterrean Rate Agreement No. 10261 Freight Tariff No. 1 FMC–1, participating in the bi-weekly meetings held in New York to discuss the rates, and sharing the expenses of the rate conference;

"8. CNAN has for at least 6 years and does now maintain a general agent in the United States for purposes of soliciting business and servicing its vessels which regularly and systematically call at ports in the United States; and

"9. CNAN has handled, through its P&I Club's United States representatives (Messrs. Frehill, Hogan & Mahar), cargo claims against itself and its vessels arising out of the ocean carriage of commercial goods to and from United States ports."

commercial conduct or a particular commercial transaction or act." If one inserts portions of §§ 1603(d) and (e) into the first clause of § 1605(a)(2), the exception then reads:

> "A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case in which the action is based upon a regular course of commercial conduct carried on by such state and having substantial contact with the United States."

Thus, the issue is narrowed to whether the "regular course of commercial conduct" is limited to CNAN's operation of the Ibn Batouta between Europe and Algeria or includes CNAN's worldwide operation of more than 70 vessels.

■ While there is a growing body of case law concerning the distinction between commercial activity and governmental activity, see *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 at 309 (2d Cir. 1981) (*"Texas Trading"*), there are no reported cases of which the Court is aware dealing with the scope to be afforded "regular course of commercial conduct." [6] By defining "commercial conduct" broadly, the Congress apparently did not intend to require that the specific commercial transaction or act upon which an action is based have occurred in the United States or have had substantial contact with the United States; only the broad course of conduct must be so connected. *But see Sugarman v. Aeromexico, Inc.*, 626 F.2d 270 (3d Cir. 1980). Thus, the first clause of § 1605(a)(2) appears to be a broad grant of subject matter jurisdiction over the commercial activities of foreign states similar to state-exercised long-arm jurisdiction. Consistent with "Congress' concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign,"

*Texas Trading*, at 313, this Court rules that a broad interpretation should be accorded "regular course of commercial conduct." [7] The Court thus finds that the present action is based upon CNAN's worldwide shipping activities which have substantial contact with the United States. Accordingly, the Court has subject matter jurisdiction over the claims against CNAN.

### 2. Third Clause

■ Recognizing that the issue of whether the Court has subject matter jurisdiction pursuant to the first clause of § 1605(a)(2) presents a novel question, an analysis of the third clause exception of § 1605(a)(2) seems warranted. That clause provides:

> "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

Thus, this third clause would require interpretation in the event that a reviewing Court were to find, with reference to the first clause, that CNAN's commercial activity did not include its worldwide shipping activity, but merely its operation of the Ibn Batouta, that is, commercial activity of the foreign state elsewhere.

Assuming then that the third clause, rather than the first clause is applicable, the pivotal issue is whether CNAN's "act" (i. e., the collision of the Ibn Batouta with the Rio Grande) caused a "direct effect in the United States." The "direct effect" requirement was the subject of extensive discussion by the Second Circuit in *Texas Trading*, which concluded "that neither 'di-

---

6. Although the first· clause of § 1605(a)(2) was at issue in *Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs*, 647 F.2d 317 (2d Cir. 1981), the discussion focused on the "carried on in the United States" requirement, and provides little guidance on the issue presented herein.

7. Of course, this broad grant of subject matter jurisdiction is subject to the constitutional constraints of the exercise of personal jurisdiction. *See infra*, at 1164.

In addition, a broad interpretation of the first clause, contrary to CNAN's contentions, does not render the second and third clauses redundant.

rect' nor 'in the United States' is a term susceptible of easy definition", *id.*, at 313. The Court apparently rejected the formulation of § 18 of the Restatement 2d of Foreign Relations Law of the United States, including its requirement that the direct effects be "substantial" or "foreseeable". *Id.*, at 311 n.32. Interestingly, however, in footnote 35 the Circuit approved the holdings of *Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056 (E.D.N.Y.1979) (plaintiff's decedent killed in Moscow hotel fire) and *Upton v. Empire of Iran*, 459 F.Supp. 264 (D.D.C.1978), *aff'd mem.*, 607 F.2d 494 (D.C. Cir.1979) (plaintiff injured by collapsed roof in Tehran), tort cases in which direct effects were limited to the direct injury to each plaintiff and, thus, not extended into the United States. Finally, the *Texas Trading* panel observed that "whether an American corporation injured overseas incurs a direct effect in the United States remains an open question." *Id.* at n.35. That open question is now before this Court.

The sinking of the Yellowstone off the coast of Gibraltar as an alleged result of a collision with the Ibn Batouta undoubtedly caused a direct effect on Rio Grande. · In determining whether that direct effect was located "in the United States", the Circuit has instructed district courts to be mindful of "Congress' concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign." *Id.*, at 313. CNAN's uncontroverted evidence indicates that on the date of the collision, the Yellowstone was the sole source of income of Rio Grande, a New York corporation, and, accordingly, Rio Grande was unable to earn freight or other monies for a considerable period of time after the collision. Affidavit of Stanley S. Unger, Vice President of Rio Grande, ¶ 5, sworn to February 4, 1981. In light of Congress' intention in enacting the FSIA, as discussed in · *Texas Trading*, this Court rules that the collision of CNAN's Ibn Batouta with the Yellowstone had a direct effect in the United States.[8]

The remaining question is whether the finding of this single direct effect is sufficient to convey subject matter jurisdiction over *all* the claims asserted against CNAN or whether a direct effect must be shown with respect to each claimant on an individual basis. The FSIA abrogates sovereign immunity "in any *case* in which the *action* is based upon ... an act [by a foreign state] that causes a direct effect in the United States." (Emphasis added). If the "action" herein is interpreted to be Rio Grande's limitation proceeding, which encompasses all cross-claims asserted against CNAN, or, alternatively, CNAN's limitation proceeding, which encompasses all claims asserted against CNAN, then the Court would have jurisdiction over all the claims asserted against CNAN. On the other hand, if the "action" is interpreted to be each individual claim or cross-claim asserted against CNAN, then the Court would have subject matter jurisdiction over Rio Grande's claim and the cargo claim of the Tunisian claimants, but not over the wrongful death and personal injury claims.[9]

---

8. The Tunisian cargo claimants contend that at the time of the collision, the Yellowstone, as an American flag vessel, was "territory subject to the jurisdiction of the United States" and, therefore, the collision with her had a direct effect in the United States. While this argument finds support in some nineteenth century Supreme Court cases, more recent cases indicate that the proposition that a merchant ship is a part of the territory of the country whose flag she flies is "a figure of speech, a metaphor." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923) (collecting cases); *see also* Restatement 2d, Foreign Relations Law of the United States, § 18, Reporter's Note 1, at p. 53.

9. The loss of Tunisia's grain cargo had a direct effect in the United States because the grain was purchased through the United States government's P.L. 480 program; the loss of the grain impeded American foreign policy means and objectives. *See* Affidavit of Robert E. Anderson, Esq., sworn to November 20, 1978. Further, the claim by the Embassy of Tunisia and Tunisia's Office National des Cereales is not barred by the Circuit's recent decision in *Verlinden B. V. v. Central Bank of Nigeria*, 647 F.2d 320 (2d Cir. 1981). The Tunisian claim against CNAN "arises under the law that creates the cause of action" and "discloses a need to interpret a federal law" (i. e., 46 U.S.C. § 181 et seq.). *Verlinden, supra*, at 325–26.

The policies of the FSIA and the Shipowner's Limitation of Liability Act, 46 U.S.C. § 181 et seq., appear to favor the interpretation that would convey subject matter jurisdiction over all the claims asserted against CNAN. 28 U.S.C. § 1607(b) apparently favors the adjudication in the American courts of *all* claims against a foreign state arising from the same transaction or occurrence, once an American court rules that it has jurisdiction over some part of the foreign state's action or intervention in an action. Since the Court has determined that it has subject matter jurisdiction over both Rio Grande's claim and Tunisia's claim against CNAN, CNAN's limitation action (78 Civ. 5972) and its claim against Rio Grande in 78 Civ. 2707 are no longer protective or conditional. The underlying policy of § 1607(b) with respect to counterclaims suggests that the Court has subject matter jurisdiction over all claims by Americans arising from the June 12, 1978 collision. Furthermore, the exercise of subject matter jurisdiction over the claims for wrongful death and personal injury is supported by the "concursus" policy of limitation proceedings which favors the adjudication in one proceeding of all claims relating to a disaster on the high seas. *See British Transport Commission v. United States*, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1975).

Accordingly, in the event that this Court's interpretation of the scope of "commercial activity" under the first clause of § 1605(a)(2) is found to be incorrect, the Court rules that it has subject matter jurisdiction over all the claims against CNAN pursuant to the third clause of § 1605(a)(2).

### 3. *Personal Jurisdiction Over CNAN*

■ Since subject matter jurisdiction exists and service has been made in compliance with 28 U.S.C. § 1608, the Court has *statutory* personal jurisdiction over CNAN. 28 U.S.C. § 1330(b). With respect to the *constitutional* constraints on personal juris-

diction, application of the four factors set forth in *Texas Trading*, at 314, indicates that the exercise of personal jurisdiction over CNAN does not offend traditional notions of fair play and substantial justice. *Id.* at 314, *citing International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The facts set forth in the stipulation and order filed on December 22, 1980, *see* note 5, *supra*, indicate that CNAN has repeatedly and purposefully availed itself of the privileges of conducting commercial activities in the United States. In light of those facts and the fact that United States flagships operate throughout the world, litigation in the United States was reasonably foreseeable to CNAN. While CNAN will undoubtedly experience some inconvenience of litigating in the United States, its claim of inconvenience must be measured against its conduct of regular commercial activity in the United States. Finally, the United States has a strong interest in hearing these suits, since an American corporation is one of the complainants and American claimants are involved. In conclusion, the Court's exercise of personal jurisdiction over CNAN satisfies the constitutional requirements as discussed in *Texas Trading*.

### Conclusion

CNAN's motion for summary judgment with respect to its claim that it is immune from the jurisdiction of this Court under the FSIA is denied. The Court holds that it has jurisdiction over CNAN's person and over all the claims asserted against CNAN in these consolidated actions.

SO ORDERED.

---

With respect to the personal injury and wrongful death claims, although the injuries to and deaths of Yellowstone crewmembers undoubtedly had effects in the United States, the Court would be compelled by footnote 35 of *Texas Trading* to rule that those effects were not direct.