COLONIAL BANK, Petitioner,

v.

**COMPAGNIE GENERALE MARITIME et FINANCIERE, Respondent.**

No. 85 Civ. 7830(PNL).

United States District Court, S.D. New York.

Oct. 15, 1986.

Cadwalader, Wickersham & Taft, New York City, for petitioner; Stephen G. Austin, Howard R. Hawkins, Jr., Joseph J. Schiavone, William D. Smith, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondent; Richard G. Ashworth, Robert C. Horner, Robert J. Rosoff, of counsel.

## OPINION AND ORDER

LEVAL, District Judge.

This action was brought by Colonial Bank ("Colonial"), a Connecticut corporation, against Compagnie Generale Maritime et Financiere ("CGMF"), a corporation wholly owned by the Republic of France, for damages caused by CGMF's arrests in France and Egypt of the Greek-flag vessel the GME Atlantico (the "Atlantico"), a vessel owned by Compania Naviera Pancarib S.A. ("Pancarib") and operated by General Maritime Enterprises ("GME") under a time charter party. Colonial brings this action both in its own right as mortgagee of the vessel, and as assignee of Pancarib's claims against CGMF.

Defendant CGMF moves to dismiss the complaint for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), and on the ground of *forum non conveniens*, pursuant to Fed.R.Civ.P. 12(b)(3). CGMF claims sovereign immunity under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 (1982). Colonial contends that four exceptions to sovereign immunity apply, and CGMF is, therefore, amenable to suit. CGMF's motion to dismiss Colonial's complaint for lack of subject matter jurisdiction is granted.[1]

*Background*

1. *Events Outside the United States.*

CGMF is a shipping corporation wholly owned by the Republic of France. At all times relevant to this action, CGMF's commercial activities consisted solely of buying and selling vessels and transferring them to corporate subsidiaries by bareboat charter basis. The French-flag vessel Carbet was acquired by CGMF on December 30, 1976. It was operated at all times under a bareboat charter by Compagnie Generale Maritime ("CGM"), a French corporation and wholly owned subsidiary of CGMF, with offices in New York and other United States cities. The Carbet was used exclusively in shipping operations between France and French Guyana, and the French Antilles and French Guyana, never utilizing United States ports. In November 1981, CGMF contracted to sell the Carbet to the Belgian corporation General Maritime Enterprises ("GME") for $2,900,000. A few weeks later, GME informed CGMF that it would refuse to honor the contract. CGMF then sold the Carbet to a Thai corporation, and brought an arbitration proceeding in London against GME.

On March 12, 1982, in an effort to secure its claim in the pending arbitration, CGMF caused the arrest in Le Havre, France of the Atlantico, a Greek-flag vessel operated by GME. Several days later, Pancarib, a Panamanian corporation, appeared before the court in Le Havre, alleging ownership of the Atlantico. CGMF asserted that although Pancarib was the registered owner of the Atlantico, Pancarib was a one-vessel corporation established by GME, and Pancarib and GME were alter egos. The court denied Pancarib's application to vacate the arrest, finding that "either the vessel belongs effectively to G.M.E. or ... [GME] has created an appearance destined to mislead third parties; COMPAGNIA NAVIERA PANCARIB appears as more or less a fictive company, more a purely legal construct than a reality...." (Simon Aff. ¶ 5.) The arrest order was, however, vacated on grounds that did not involve a ruling on ownership or on the alter ego theory, without prejudice to further attachment, and the vessel was released on April 8, 1982. Later the court reversed this decision reinstituting the order of attachment but only after the vessel had gained her freedom.

In April 1982, CGMF was awarded damages against GME in the London arbitration in the amount of $799,958 plus interest, and shortly obtained judgments on the

---

**1.** It is unnecessary to reach the issue of *forum non conveniens.*

award both in England and in the Southern District of New York. Predicated on the award and English judgment against GME, on October 14, 1982, CGMF obtained an *ex parte* arrest order from the Court of First Instance of Alexandria, Egypt and succeeded in arresting the vessel. On February 20, 1984, the Court of Imposition of Alexandria vacated the arrest order, holding that the arrest was wrongful because the Atlantico was not the property of GME. CGMF's appeal to the Alexandria court was dismissed that October. On April 8, 1984, while its appeal was still pending in Alexandria, CGMF obtained an *ex parte* order from the Court of First Instance of Cairo, Egypt and again secured the arrest of the vessel. That arrest order was vacated on January 6, 1985.

2. *Events Within the United States.*

On January 28, 1982, Pancarib and Colonial Bank entered into a loan agreement whereby Colonial loaned Pancarib $1.9 million to be used to finance Pancarib's purchase of the Atlantico. Pursuant to the loan agreement, Pancarib executed a First Preferred Ship's Mortgage (the "Mortgage") and assigned the Atlantico's earnings to Colonial.

Shortly after the arrest in Le Havre, Pancarib defaulted on the mortgage. In October 1982 both Pancarib and Colonial demanded that the arrests be vacated. (Complaint ¶ 71.) Upon learning that neither GME nor Pancarib had any other assets to secure the judgment against GME, and that Colonial had an interest in the release of the Atlantico and was legally entitled to act with respect to the vessel,[2] CGMF sent attorneys in New York to Colonial to discuss the release of the vessel in exchange for security on, or settlement of, CGMF's claim against GME. (Horner Aff. ¶ 7.) Nothing came of these discussions. On April 30, 1985, Pancarib assigned to Colonial all its claims against CGMF, and Colonial brought this action in October 1985.

Colonial alleges tortious interference with the Atlantico, claiming that both Pancarib and Colonial were injured by the three arrests of the vessel. Colonial claims that if the vessel had not stood idle for two years, it would have been profitably employed by Pancarib which would not have been forced to default on the $1.9 million loan.

*Discussion*

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 (1982) (the Act or the "FSIA"), is the exclusive source of subject matter jurisdiction of suits involving foreign states. *De Letelier v. Republic of Chile*, 748 F.2d 790, 793 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2656, 86 L.Ed.2d 573 (1985). Section 1330(a) of the Act confers original jurisdiction on district courts "without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a) (1982). Neither party disputes that CGMF is an "instrumentality" of a foreign state as defined in § 1603 and thus entitled to a foreign state's immunity.[3] Unless the immunities of the Act failed to come into effect by reason of pre-existing treaties between the United States and France, 28

---

**2.** Under the Mortgage, Colonial was "at liberty to pay and discharge all [liabilities] and/or to take any such measures as it deem[ed] expedient or necessary for the purpose of securing the release of the Vessel." Mortgage, cl. 8.02.03.

**3.** A "foreign state," as defined in the FSIA, includes "an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a) (1982), which is "any entity ... a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b)(2). CGMF, a legally distinct corpora-

tion, wholly owned by the Government of France, clearly fits within the definition set out in § 1603. *See, e.g., O'Connell Machinery Co. v. M.V. Americana*, 734 F.2d 115 (2d Cir.), *cert. denied*, 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984) (shipping company, majority owned by subdivision of the Republic of Italy, was a "foreign state"); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274 (2d Cir.1984) (corporation, a controlling interest of which was owned by the Chilean Government, was a "foreign state").

U.S.C. § 1604, CGMF is "immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607." 28 U.S.C. § 1604 (1982). This court then lacks subject matter jurisdiction unless one of the statute's exceptions applies. *See Verlinden G.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983). Section 1605 sets forth the relevant exceptions,[4] as follows:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication ...;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; ... or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....

28 U.S.C. § 1605(a).

### 1. The "International Agreement" Limitation

■ The initial question is whether a pre-existing treaty between France and the United States rendered the immunities of the FSIA inapplicable under § 1604. "Subject to existing international agreements to which the United States [was] a party at the time of the enactment of this Act a foreign state shall be immune...." 28 U.S.C. § 1604 (1982). The United States was, and is, a party to a 1959 treaty (the "Convention") with France, known as the Convention of Establishment, Protocol and

Declaration, November 25, 1959, United States-France, 11 U.S.T. 2398, T.I.A.S. No. 4625. Colonial contends that this pre-existing treaty waived any immunity for French companies in U.S. courts thereby preventing the grant of immunity in § 1604 from taking effect.

The Convention provides that "[n]ationals and companies of either [country] shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other activities for gain within the territories of the other [country]," art. V, and that companies of either country "shall have their juridical status recognized" in courts of the other country, art. XIV.

The Convention's assurance of "national treatment" and "juridical status" means that French companies are to enjoy the same rights as American companies in United States courts. Thus Article XIV provides that French companies are to receive treatment "upon terms no less favorable than the treatment therein accorded, in like situations" to United States companies. Convention, art. XIV, at 2415. It is intended to guarantee the rights of nationals and companies of the foreign state, not take them away. Article III of the Convention, which expressly deals with judicial issues, provides that nationals and companies of the two countries shall have access to the courts of the other country, and that agreements to arbitrate shall be respected. It does not address immunity of government entities in any respect.[5] In contrast, other treaties of the United States expressly disavow immunity for publicly-owned enterprises engaged in commercial activities

---

**4.** The Act also provides exceptions for actions "in which rights in property taken in violation of international law are in issue," 28 U.S.C. § 1605(a)(3) (1982); actions "in which rights in property ... acquired by succession or gift or rights in immovable property situated in the United States are in issue," *id.* § 1605(a)(4); actions "for personal injury or death, or damage to or loss of property, occurring in the United States," *id.* § 1605(a)(5); "in any case in which a suit in admiralty is brought to enforce a mari-

time lien," *id.* § 1605(b); or with respect to certain counterclaims, *id.* § 1607.

**5.** The House Report states that "[t]o the extent that [international agreements with provisions pertaining to immunity] are silent on a question of immunity the [FSIA] would control; the international agreement would control only where the conflict was manifest." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6616. In this case, not only is there no "manifest conflict,"

in the contracting state.[6] I conclude that the provisions of the Convention simply do not deal with the issue of governmental immunities and do not preempt the later grant of immunity by the FSIA.

### 2. The "Waiver" Exception

The first exception to the grant of foreign sovereign immunity under § 1605 is for waiver. It provides that "[a] foreign state shall not be immune ... in any case ... in which the foreign state has waived its immunity...." 28 U.S.C. § 1605(a)(1) (1982). Unlike other limitations on subject matter jurisdiction, foreign sovereign immunity may be waived "either explicitly or by implication." *Id.* Explicit waivers are generally found in treaties and contracts. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6617 (hereinafter cited as *House Report*). CGMF and Colonial have not entered into any contracts, and there is no treaty including an agreement of waiver. (See above.)

Implicit waivers are sometimes found in the actions of the foreign sovereign relating to the justiciability of the controversy. Courts have found a foreign sovereign's utilization of United States courts to advance its own interests to be incompatible with a claim of immunity from the jurisdiction of the same courts for related matters. *See First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462

U.S. 611, 633–34, 103 S.Ct. 2591, 2603, 77 L.Ed.2d 46 (1983). Colonial contends that CGMF implicitly waived its defense of immunity to suit by having the English arbitration award confirmed in the Southern District of New York, employing a New York law firm to represent it in its negotiation with Colonial regarding the Egyptian arrests of the Atlantico, and pleading the judgment of this court confirming the arbitration award as an affirmative defense in this action.

In the legislative history of the Act, Congress noted three situations in which, prior to the Act, courts found implied waivers to foreign sovereign immunity: (1) a foreign state had agreed to arbitration in the United States;[7] (2) a foreign state had agreed that its contract was governed by the laws of the United States;[8] and (3) a foreign state had filed a responsive pleading in a suit without raising the defense of sovereign immunity.[9] *House Report* U.S.Code Cong. & Admin.News 1976, at 6617. Since the enactment of the FSIA, courts have been reluctant to extend the bases of implicit waiver beyond these three examples. Courts have construed the implicit waiver clause of § 1605(a) narrowly.[10] For example, most courts have refused to find an implicit waiver of immunity to suit in United States courts by reason of waiver in a jurisdiction other than the United States. *See, e.g., Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 500 F.Supp.

---

but the Convention is completely silent with respect to immunity.

**6.** *E.g.,* Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, United States-Iran, art. XI, 8 U.S.T. 899, 909, T.I.A.S. No. 3853 ("No Enterprise of either [Party], including corporations ... shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other [Party], claim or enjoy ... immunity therein from ... suit...."); Treaty of Friendship, Commerce & Navigation, Jan. 21, 1950, United States-Ireland, art. XV, 1 U.S.T. 785, 797, T.I.A.S. No. 2155 ("No enterprise of either Party which is publicly owned or controlled shall, if it engages in commercial ... activities within the territories of the other Party, claim ... immunity therein from ... suit....").

**7.** *See, e.g., Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F.Supp. 311 (D.D.C.1980).

**8.** *See, e.g., Marlowe v. Argentine Naval Commission,* 604 F.Supp. 703 (D.D.C.1985).

**9.** *See, e.g., Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.,* 727 F.2d 274 (2d Cir.1984).

**10.** *See Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 378 (7th Cir.1985) (per curiam) (USSR's signing UN Charter and Helsinki Accords did not constitute waiver of sovereign immunity); *Transamerican Steamship Corp. v. Somali Democratic Republic,* 590 F.Supp. 968, 973–74 (D.D.C.1984) (participation in American foreign aid program was not an implicit waiver of immunity), *modified,* 767 F.2d 998 (D.C.Cir.1985).

320, 323 n. 3 (S.D.N.Y.1980), *rev'd on other grounds,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1300–02 (S.D.N.Y.1980), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).[11] Also, engagement in commercial activity in the United States was found not to constitute an implicit waiver of sovereign immunity. *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1058 (E.D.N.Y.1979).

■ Colonial contends that by obtaining a judgment in this court confirming the arbitration award, CGMF waived its defense of immunity in this related action. I do not agree. Although there is a relationship between CGMF's judgment and the subject matter of Colonial's suit (both being efforts by CGMF to collect its due from GME), there is also a clear, significant difference.

Colonial's suit charges CGMF with abuse of process consisting of its repeated seizures of the Atlantico. These are alleged to be tortious because GME is claimed by Colonial to have had no attachable ownership interest in the Atlantico. CGMF's suit here for confirmation of the arbitration award seeks recovery of its due from GME. Although the arrests were premised on the same liability of GME as CGMF's suit, the two suits involve completely different issues. CGMF's suit in this district to confirm its arbitration award against GME dealt with GME's liability arising out of its contract to purchase the Carbet and involved no issue whatsoever as to whether GME owned an interest in the Atlantico. Colonial's suit charging CGMF with abuse of process involves Colonial's contention that GME owned no attachable interest in the Atlantico and had nothing to do with whether GME had incurred a liability to CGMF in connection with the Carbet contract.

The relationship between CGMF's action against GME and Colonial's action against CGMF is, therefore, rather superficial and I do not find a basis for concluding that CGMF's suit against GME waived its sovereign immunity as to Colonial's action against it.

The conclusion might be otherwise if GME were the plaintiff in this action. *See Paterson Zochonis (U.K.) Ltd. v. Compania United Arrow, S.A.,* 493 F.Supp. 621, 624 (S.D.N.Y.1980). But Colonial disavows any relationship with GME and denies that its assignor Pancarib stands in alter ego status with GME. Indeed, the gist of Colonial's action is to assert that CGMF's dispute with GME was not a valid reason for it to arrest Pancarib's vessel.

■ Colonial also contends that CGMF has implicitly waived immunity by incorporating into its answer, as an affirmative defense of set-off, the judgment against GME.[12] (Answer ¶ 9.) Colonial alleges that by asserting its United States judgment as a defense or set-off while claiming immunity, CGMF is abusing the United States courts. I see no basis for this argument. It would be otherwise if CGMF had brought an action in a United States court against Colonial and claimed sovereign immunity to avoid Colonial's counterclaim. *See* § 1607. Here, however, the judgment is being employed only defensively. CGMF is not seeking relief from Colonial. The judgment supports one of several theories by which CGMF seeks to avoid, negate or reduce the liability Colonial seeks to inflict on it. A defendant's assertion of one defense does not forfeit the timely assertion of another. *Cf. In re Rio Grande Transport, Inc.,* 516 F.Supp. 1155, 1159 (S.D.N.Y. 1981) (defendant did not waive immunity by filing a "conditional" complaint that would

---

**11.** The only case to the contrary, *Ipitrade International, S.A. v. Federal Republic of Nigeria,* 465 F.Supp. 824, 826 (D.D.C.1978) (contract's choice of Swiss law and European forum to resolve disputes waived immunity in United States), has not been followed.

**12.** "[D]istrict courts have discretion to determine that the conduct of a party in litigation does constitute a waiver of foreign sovereign immunity in light of the circumstances of a particular case." *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.,* 727 F.2d 274, 278 (2d Cir.1984).

be pursued only if the immunity defense was rejected).

I conclude that CGMF has neither explicitly nor implicitly waived immunity within the meaning of § 1605(a)(1) of the FSIA.

### 3. *The "Commercial Activity" Exceptions*

■ The second exception to foreign sovereign immunity under the Act, § 1605(a)(2), generally makes foreign states liable to suit in United States courts insofar as concerns their commercial activity, if one of the three conditions relating the commercial activity to the United States is satisfied.

Colonial contends the first and third clauses are applicable.[13] The first clause provides that foreign states shall not be immune from suits "based upon a commercial activity carried on in the United States by the foreign state." *Id.* The third provides that no immunity shall exist if the suit is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

### A. *The First Clause*

Commercial activity "carried on in the United States" under the first clause, is defined in the Act as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e) (1982).[14] The Court of Appeals has read this clause to focus not on whether the defendant generally engages in commercial activity in the United States, but on whether the particular conduct giving rise to the claim is, or is not, an integral part of commercial activity having substantial contact with the United States. In *Ministry of Supply, Cairo v. Universe Tankships, Inc.,* the court held:

> When a foreign state has carried on a commercial activity within the United States, the first clause of § 1605(a)(2) thus withdraws immunity ... with respect to acts outside the United States if they comprise an integral part of the state's "regular course of commercial conduct" or "particular commercial transaction" "having substantial contact with the United States."

708 F.2d 80, 84 (2d Cir.1983) (Friendly, J.).

The acts upon which this action is based did not occur in the United States and were not integrally related either to particular acts in the United States or to commercial conduct having substantial contact with the United States. CGMF's arrests of the Atlantico occurred in France and Egypt. They had no connection to the United States, or to CGMF's commercial activities "carried on in" the United States. CGMF's commercial activity related to this lawsuit was limited to the acquisition of vessels for bareboat charter to CGMF's subsidiaries. The subsidiaries and charterers, but not CGMF, operated the vessels calling at United States ports. Far from comprising "an integral part" of commercial activity in the United States, CGMF's contract to sell the Carbet, the subsequent London arbitration,

---

**13.** The second clause has no relevance because the activity on which Colonial's action is based—the alleged tortious interference with the Atlantico—is not claimed to have been "performed in the United States." 28 U.S.C. § 1605(a)(2), second clause.

**14.** Congress "underscore[d] the fact that the 'commercial activity carried on in the United States' must be *substantial* to support jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1296 (S.D.N.Y.1980) (emphasis added), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). "In choosing those words, Congress made clear that the immunity determination under the first clause diverges from the 'minimum contacts' due process inquiry...." *Maritime International Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1109 (D.C.Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), the court held that notwithstanding the legislative history of the FSIA, the constitutional concept of due process in personam jurisdiction under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), must be independently considered in FSIA cases. *Texas Trading* at 313–15. Defendants do not contend that the due process inquiry under *Shoe* is not met.

and the arrests of the Atlantico, had no connection to any commercial activity "having substantial contact with the United States."

The only act of CGMF in the United States having any relationship to this action was the suit in the Southern District of New York against GME. Colonial argues that CGMF's suit constituted commercial activity in the United States. Without deciding whether the institution of litigation can ever constitute commercial activity, this did not satisfy the exception. As defined in the FSIA, "[a] 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. *The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.*" 28 U.S.C. § 1603(d) (1982) (emphasis added). Colonial has failed to support jurisdiction based on the first commercial activity clause.

### B. *The Third Clause*

■ The third clause of § 1605(a)(2) denies immunity if "the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (1982). The issue presented is whether CGMF's arrests of the Atlantico in France and Egypt have caused a "direct effect" on Colonial in the United States.

The statute does not define "a direct effect." Court interpretations have included "one which has no intervening element, but, rather, flows in a straight line without deviation or interruption," *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C.Cir.1979); and, one that is a directly foreseeable result of acts outside the United States. *See Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056, 1062–63 (E.D.N.Y.1979).

In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148,

102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), the Court of Appeals held that because corporations are intangible and can only suffer monetary losses, "the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss." *Id.* at 312. The Court held that a breach of contract precluding American companies from collecting money owed had a direct effect in the United States. *See also Exchange National Bank v. Empresa Minera del Centro del Peru, S.A.*, 595 F.Supp. 502, 505 (S.D.N.Y.1984) (defendant's nonpayment of a promissory note due in New York had a "direct effect in the United States"); *In re Rio Grande Transport, Inc.*, 516 F.Supp. 1155, 1163 (S.D.N.Y.1981) (the collision and sinking of an American-owned vessel off the coast of Gibraltar had a "direct effect in the United States").

Colonial claims that the financial injury it suffered as mortgagee of the Atlantico was a directly foreseeable result of CGMF's allegedly wrongful arrests and was therefore a direct effect. I do not believe this comes within the statutory exclusion.

Colonial had loaned money to Pancarib to finance Pancarib's purchase of the vessel. As security for the loan, it took back a mortgage of the vessel; to secure mortgage payments it took an assignment of the Atlantico's earnings. CGMF's seizures of the Atlantico did not alter Colonial's rights as against Pancarib, which continued to owe periodic mortgage payments. Had Pancarib possessed funds it could have paid its debt-service obligations to Colonial, notwithstanding the arrests. The consequence of the arrests to Colonial was to diminish the value of its security as the Pancarib's earnings from the Atlantico, assigned to Colonial to secure the loan payments, were reduced to nothing during the vessel's captivity. Thus, when Pancarib was unable to make its payments, the account it had assigned as security was empty. If the words of the statute are to be construed in accordance with their normal meaning, I would conclude that CGMF's seizures of the Atlantico, although directly

affecting the interests of its owner, had but an indirect effect on the mortgagee.

There is no doubt that the injury to Colonial was real and costly. Very likely (depending on the terms of the financing) the loss was more costly to the bank than to the owner, which may have placed little capital at risk. But the size of the loss is not determinative of the United States Courts' jurisdiction, which turns rather on whether the injury was "direct."

An arrest of a vessel can cause an infinite variety of losses. Shippers and/or consignees of cargo can be forced into default on obligations. Construction projects can be brought to a halt for lack of necessary material delayed in transit. Bank loans to all such venturers can come into default, and if inadequately secured, can cause losses to the banks. It would be small consolation to such victims to learn that their losses were merely "indirect." But as to the assertion of jurisdiction over foreign states on such claims, that is the dividing line Congress has drawn.

And if there is an apparent arbitrariness in having jurisdiction turn on the directness of the injury, its effect is diminished by the fact that a similar dividing line determines the very existence of a cause of action and whether injured parties have "standing" to assert it.

Finally, the direct/indirect distinction serves a meaningful end in relation to the statute's objectives in foreign relations. The statute seeks a balance between the provision of a convenient forum for claimants aggrieved in commercial dealings with foreign states and the promotion of comity and harmony between the United States and other nations. *House Report* U.S.Code Cong. & Admin.News 1976, at 6616. To extend jurisdiction to claims brought by all persons indirectly injured by commercial acts of foreign states would subject them to the jurisdiction of United States courts in an enormously expanded number of cases (including, no doubt, many that would eventually be dismissed for failure to state a cause of action). Given the proclivity of the United States population to devise lawsuits for every contretemps, the harassment of foreign sovereigns by exposure to the jurisdiction of United States courts would no doubt be considerable. Thus the statutory clause limiting jurisdiction over foreign sovereignties to instances of "direct" effect serves a valuable goal of foreign relations and should not be nullified by freehanded court interpretation.

*Conclusion*

I conclude that none of the exceptions to sovereign immunity of the Foreign Sovereign Immunity Act apply. CGMF's motion to dismiss the complaint for lack of subject matter jurisdiction is granted.

SO ORDERED.